Good morning. May it please the Court, my name is Paul Thompson on behalf of Mr. Iverson. Section 2680H of the Federal Tort Claims Act waives the government's immunity from suit in clear and unambiguous terms. It extends the waiver in a limited way to just six intentional torts when they are committed by, quote, investigative or law enforcement officers. The statute in as, quote, any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law. The question today is whether transportation security officers, the men and women who search you and pat you now when you go through the airport, are, quote, any officer of the United States who is empowered by law to execute searches. And for several reasons we think they are. First, they're officers. They were reclassified as officers in 2005 by the Transportation Security Administrator. And they wear badges that say United States Officer. Can you describe what that reclassification entailed? Was it just a name change or was there actual change in the description of function? I don't think there was a significant change in the description of the function, Your Honor. All we can tell is there's a hearing that took place that describes the reclassification. And it's Kip Hawley, who's the Transportation Security Administrator, talking about how this title reflected more the stature and the importance of the job. A few years after that the badges came in the uniform that said United States Officer. And then in the last three or four years, I don't have the exact date, they started training.  I don't know if the function changed that much, but they started going to the Federal Law Enforcement Training Center now in Georgia to get trained on things like explosives and things that they weren't apparently trained on that way before. So there's an increase in training. You're saying that... There is. You can find it on the website, the Federal Law Enforcement Training Center. It's something called TSA Academy that they go to now and have been going to for the last several years. So there's a recognition by the agency of the stature and importance and the dignity of this function that I think is recognized by the title that's there. Now the Third Circuit of Pellegrino, in an en banc court decision, determined that this also fell within the plain meaning of officer because they performed significant national security functions, that they were held by their agency with a certain degree of status, and that their duties were actually prescribed by law. Which brings us to the second part of the statute, which is, are they empowered by law to execute searches? Let's go back to the first. Doesn't the Aviation and Transportation Security Act draw a distinction referring to screeners as employees and then, I guess, the administrator can designate officers who carry guns and do other law enforcement things? Correct. Isn't that where we should start? I think it's part of what you can look at, but it's not ultimately dispositive for this reason. This statute, the Federal Tort Claims Act, has its own definition. It says, for the purposes of this subsection. And it uses the term investigative or law enforcement officer. The provision that you're referring to in the ATSA does originally call them screeners. They were reclassified later to be referred to as officers. But not in the statute. Not in the statute, correct. And there is a section called Section 114P, which allows the transportation security administrator to designate people as law enforcement officers. And admittedly, transportation security officers are not designated under Section 114P as law enforcement officers. But we don't contend they are. We contend they're investigative officers. And the statute provides for investigative or law enforcement officers. And in fact, there's an interesting analog to that. In 1968, Congress, six years before the amendments at issue here, Congress passed something called the Wiretap Act. In an 18 U.S.C. Section 2510.7, which is in our brief, they use the same phrase, investigative or law enforcement officer. And there has been case law on what those terms mean. A couple things have come out of that case law.  The or, the disjunctive, matters. Second, that an investigative officer need not be a criminal officer. And there are, and the In Re Electronic Surveillance is a Sixth Circuit case that holds such. In Re Grand Jury is an Eleventh Circuit case that holds the same. And in fact, in In Re Electronic Surveillance, the government, in its brief, in that court, and it's cited in the opinion, actually said investigative officers are different and they need not enforce the criminal laws. And so there is a class of people that fall under the statute who are involved in investigative work, who do searches, who may not be exclusively law enforcement officers. Is there a difference between an administrative search, which arguably that's what TSA is doing, versus an investigative, they're not investigating any allegation of criminal activity. They're simply performing an administrative screening as a prelude to boarding an aircraft. They are performing an administrative search. However, their standard operating procedures provide that what they are looking for are weapons, incendiary devices, and explosives. And under the law, and we cite these in our brief too, there are criminal penalties for carrying firearms on a plane, explosives on a plane as well. And there are several provisions that we said in our brief. So they are looking for that. They're not just looking for water bottles. They are looking for things that would violate the criminal laws of the United States if they take them onto an airplane. So that is definitely what they're looking for. It is administrative in nature in the sense that the courts have ruled, the Third Circuit held this, the Ninth Circuit has held this, that justifying the entire scheme of screenings at an airport and searches at an airport are administrative in nature. But these TSOs are looking for things that do violate the criminal laws of the United States. And that's 49 U.S.C. 46505 is carrying a gun or an explosive, 49 U.S.C. 463112 is hazardous materials as well. The whole scheme was set up to combat air piracy. And so air piracy is also a crime. And so they are looking for people who are trying to evade detection and bring harm to the United States. Is this consensual screening really an investigation though? Well, we think it is in the sense that what they are looking for are things that could violate the laws of the United States. It's not always consensual though. So this court in Kroll, not dealing with the same factual scenario we have here, but it dealt with a search of an attache case in the airport. And the court was told, well, that's consensual because in order to get on the plane, you have to consent to have your attache case searched. And this court said, we will not find that to be consensual because someone should not be made to trade their right to travel for their protections under the Fourth Amendment. And determined that that was actually not consensual. The Third Circuit, in a series of cases that are cited in Pellegrino, holds that these searches at the airports are not consensual because once you get into them, you are not free to leave. Once you walk into what's called the sterile area, you put your bag on the whatever it's X-rayed on, you cannot leave. And the reason you can't leave is because it would create an opportunity for terrorists to kind of scope out the system and find vulnerabilities in it and just walk out when they saw how the detection system was working. If they're not consensual, what's the basis for them? Well, the basis for it is the national security. It's in order to identify threats. I understand the purpose. What's the basis that allows it to happen if it's not consensual? The basis for, the legal basis for the screenings at the airport. Well, Congress provided by statute that we could do it. And in addition, the courts that have viewed it said there are certain... Congress can't override the Fourth Amendment, though. So it's akin to a checkpoint search or to a immigration search where the courts have determined that there is, in those kinds of searches, important national interests that are at stake in order to identify either threats to the United States or in the case of a checkpoint search, people who might be coming in illegally. And so at those situations, the courts have determined that that is constitutional and it's not based on consent. And we cite these cases in our brief. Akai is the Ninth Circuit case, and the Third Circuit case, Pellegrino, cites Hartwell and George Christie. So do you think the Pellegrino case we should follow? We do. I do think that this court should follow the Pellegrino case. I think the Pellegrino case follows the clear language of the statute. The government's argument is that this should be limited to criminal officers or people who just enforce the criminal laws. And this court could actually say that criminal law is a part of this and still rule in our favor because of the statutory provisions at issue and because these TSOs are looking for criminal violations. However, you need not do that. The government's position is that the word criminal is somehow in the statute or the word traditional is somehow in the statute. But what it ignores are some basic things of the statute. One, it's in the disjunctive. You need someone to search, seize, or arrest. You don't need all three. And the kinds of law enforcement officers the government point to as falling within the statute traditionally have all three functions. Second, it uses the phrase, any officer of the United States, which the Supreme Court in Ali has said is officer of whatever kind. So it has a broad reach. Third, in Millbrook, the Supreme Court interpreted this very provision, granted in a different factual situation, and said it was clear and unambiguous and that the court should not read limits into the statute that aren't there. And fourth, the phrase investigative officer, which is the thing that starts it all, which is different, we think, than a traditional law enforcement officer and is something that the case law has provided need not be the same as a criminal law enforcement officer. So for those reasons, we think that the statute is clear and unambiguous. And attempts to read limitations into it that aren't there would just be very problematic. Can I come back to my earlier question? Because we got sidetracked with whether it was consensual. And I guess my real question is, is a screening an investigation? I would say a screening is a search, which is how the statute here defines the power that an investigative officer must have. And so I apologize if I created confusion of that. Really it says an investigative or law enforcement officer is, quote, any officer of the United States empowered by law to execute searches. And a screening is a search. Also a pat-down is a search. It's akin to a Terry search. And those are also within the power of TSOs to perform. And the phrase pat-down actually exists in the statutes, 49 U.S.C. 44935. So, Your Honor, I'd ask for three minutes for rebuttal. And if the court has more questions, I'm happy to answer them now. Otherwise, I'll reserve the balance of my time. All right. Thank you, Mr. Thompson. Thank you. Ms. Swinkle? Thank you, Your Honors. Sharon Swinkle from the Department of Justice representing the United States this morning and with me at council table is Pamela Marantette from the U.S. Attorney's Office. I'd like to begin with the text of the statute because I do believe that the text provides the right answer here. And I would point to four specific textual indicia that support the conclusion that TSA screeners are not investigative or law enforcement officers within the meaning of the proviso. First, that very phrase, investigative or law enforcement officers. An investigative officer, an officer who conducts an investigation, is not the normal way we might understand someone who performs an administrative search at their checkpoint. Second- No, wait. Administrative searches I think of are like the housing in the Seattle case and in other Supreme Court cases. And they are investigating. They're enforcing a housing code and investigating whether the place is up to code. So I think they are investigating officers. Well, Your Honor, I'd like to go through all four because I think they really work together. Second, when you look at the defined term, we're talking about officers who are empowered by law to execute searches to seize evidence or to make arrests for violation of federal law. Both the normal understanding of executing a search for violation of the federal law, which at the time the proviso was enacted, had been used by Congress and the courts to refer only to traditional law enforcement searches. And the other terms, because I think all three terms need to be read together under- I don't think they can be read disjunctively as I- that seems to be the view of- Well, I'd say, Your Honor, to read it disjunctively would be contrary to the normal interpretive canon that we read statutes with terms read in context. It would be quite contrary to what the Supreme Court did in the Dolan case where interpreting in subsection B, the postal exception to the- What would be the functioning of or in that sentence if it's not disjunctive to- I agree that it's disjunctive, Your Honor. For example, there certainly are officers who may execute searches, perhaps an FBI agent who is not himself empowered to have the full range of authority but participates only in the search execution function. We agree you don't need to have all three, but I do think that the second and third clauses should inform the meaning of execute searches. And I would point out that the phrase is also best understood that the last antecedent for violations of federal law can naturally be understood to apply to all three of the similar items in the list. And obviously, to execute a search for violation of federal law is not what TSA screeners do. If I could just point to two more textual indicia, note that the definition applies only to an officer of the United States. And of course, other- Any officer? It says any officer, but it uses the term officer, not employee. And if you look, for example, to what the Pellegrino majority did, it used that term officer as if it was coextensive with employee, which makes no independent significance of Congress's decision in subsection A, for example, to create other exceptions which apply more broadly to all employees of the government. What's to be made of the use of the term officer for TSA, formerly employees now referred to as TSA officers who attend an academy for their training? Your Honor, I would say that that change in title, and it's not a change in legal status, it did not denote a change in their functions, was intended to be an outward-focusing change. Obviously, we want to encourage the traveling public to treat them with respect and listen to the things that they are asking people to do, but that did not involve any change in functioning. And of course, we can look to the statute to understand sort of the differences under the organic statute here. So it was intended to have a psychological effect, but not a real effect in terms of status? It did not reflect a change in the status of their job functions or duties. That's correct, Your Honor. And then fourth and finally, in the text itself, I would note that the proviso brings back in a waiver of sovereign immunity only for specific intentional torts, not all of the intentional torts covered by the FTCA. Intentional tort exception, but a subset of those that are the typical kinds of torts that would be committed by a traditional law enforcement official abusing his power. I think the intuition that a TSA screener is not an investigative or law enforcement officer of the United States not only gains support from those textual clues in the proviso itself, but also from, of course, TSA's own organic statute. And of course, we are instructed by Congress to look to the powers held by an individual under the law to understand whether they fall within this proviso. Under the Aviation, Transportation, and Security Act, Congress made a clear distinction between passenger screeners in 49 U.S.C. 44901. The administrator of the TSA is directed to provide for the screening of passengers and property and also told that that screening should be carried out by a federal government employee. And then in a separate section of that very same statute, subsection H, the administrator is ordered to deploy law enforcement personnel authorized to carry firearms at each screening location to ensure passenger safety. So there's a clear textual distinction in how those different kinds of employees are referred to. And what about this court's simple case, the Crow case, it says searches under the Fourth Amendment include airport screenings. So I'm a little puzzled by my opposing counsel's reliance on that case. That case involved a search carried out by a U.S. marshal who believed that the passenger posed a criminal threat, was a potential hijacker, and it was conducted for the purpose based on that individualized suspicion of trying to ascertain whether there was a potential violation of federal criminal law. What TSA screeners do is fundamentally different. They carry out a prophylactic search to ensure that passengers... You're aware that screening is in the very first section of the screening statute and later it says manual search screening includes, means, not includes, means a physical examination? Gosh, it sounds like a search. So it's a physical examination of property carried by, you know, baggage carried by a passenger into a secure area and a search that can be very different depending on how, you know, you might go through a metal detector and not alarm and never be touched. You may go through an AIT scanner and not alarm and never be touched. What do you think the term manual search means? Exactly. There are many different kinds of ways that TSA screeners carry out searches. Well, manual, if you know where the word manual comes from, means by hand. Manual search, by hand search. So the screeners carry out a search under the standard operating procedures established by the administrator and unless there is a reason to conduct a pat-down search, one is not done, but that is never done on the basis of individualized suspicion of criminal activity. And I would point out the whole sort of baseline... Is only a reasonable suspicion required? No, Your Honor, because TSA screeners are not empowered to search for violations of federal law and if they inadvertently discover evidence of violations of federal law, they don't have any authority to seize evidence or to do anything to prosecute or arrest the officer, the individual. They would call local law enforcement officials or TSA law enforcement officials who are on site to follow up on that. It's just a fundamental misconception that they somehow have a power of detention or arrest that's not within their authority. It includes search, right? So... They do search. So what about this argument that searching, that it is illegal to bring a firearm onto a plane, therefore when you're searching for a firearm, amongst other illegal things, that that is searching for a violation of federal law? So if I could say a couple things about that, Your Honor. First, they're searching for any prohibited items, including a soda can, a lotion bottle, a tube of toothpaste, a car battery, hiking poles, a... A bomb and a gun. Go ahead. A gun, you know, items that are potentially dangerous on board, many of which are entirely legal to own and possess...  ...can't be taken onto a plane. For many of those items, if they discover them, they give people an option. They can throw them away. They can give them to somebody who's not going to board the plane. They can decide not to board and take the item back. In those cases... What about the stuff where they don't let give you that option? Some people inadvertently have a gun. They really do. And then they pick up the spouse's bag, and there's a gun, and that's not inadvertent. Well, some people have a license to carry a gun, and I think... No, no, no. These are people who don't have a license to... ...in those circumstances, they would, again, ask the person to wait, and they would summon local law enforcement officials or federal law enforcement officials. But the TSA screeners themselves have no authority to take action to... Well, they executed the search, though. Well, certainly, they do conduct administrative searches. And I want to be very clear, if we thought that was for the purpose of carrying out or searching for violations of criminal law, I think that would cast a real shadow on the lawfulness of what they do under the Fourth Amendment, because, of course, we know from Terry and the criminal law context that you need individualized suspicion to search people outside of the administrative search context. Now you're back to the Crowe case. And that is very... And exactly. And that was the kind of search that was at issue there. But certainly, this court has never suggested, nor has any other court, that the routine practice of aviation security screening without individualized suspicion is somehow constitutionally suspect. And the Supreme Court has, without reaching or deciding the question, you know, adverted a number of times to the salutary practice of carrying out such searches in its cases involving border searches and the like. So we would point out that the ramifications of the argument would be quite broad. If I might just turn briefly, obviously, in our view, and I didn't quite get to 49 U.S.C. 114, but I think that statute, like 44901, really makes clear the very fundamentally different powers that screeners have and that TSA law enforcement officials have. Here, too, under subsection E, the administrator is responsible for hiring screeners, and they're called security screening personnel for developing standards, for training them and testing them, and to make sure that they carry out their screening functions. In a very different provision, subsection P, the administrator designates employees of the TSA to serve as law enforcement officers, and those law enforcement officers are authorized to carry a firearm, to make an arrest without a warrant if they have probable cause, to seek and execute warrants for arrest and seizure of evidence. Those are the kinds of functions that Congress was thinking about when it enacted the law enforcement proviso. And I think you can look at that not just in the text, but, of course, the legislative history of the law enforcement proviso shows that it was animated by extremely controversial no-knock raids carried out in the middle of the night against innocent people that Congress had before it, and I think the Pellegrino dissenters do a very nice job of comprehensively discussing the legislative history. At the time that Congress enacted the law enforcement proviso, it had several proposals before it. One of it would have waived the federal government's sovereign immunity for intentional torts by all federal government employees. That was actually a proposal by the Department of Justice, but Congress rejected that. The members of Congress discussed that the narrower version of the law enforcement proviso that was ultimately enacted would not cover intentional torts carried out by federal employees who are carrying out administrative searches of the sort at issue here, but Congress chose intentionally to enact the narrower version that is currently the law. Are you aware of any advocacy or any effort to seek modification of the law? I am not aware of subsequent efforts to seek... It seems that's the best solution would be for Congress to clarify this rather than have courts deciding this one way and then the other and back and forth and then the appellate courts and ultimately the Supreme Court. I don't disagree, Your Honor, but I think the answer is the same answer that this court had in... that the Third Circuit had in Vanderklok, which is that it is ultimately up to Congress to create remedies. And here, in waiving narrowly the federal government's sovereign immunity, including immunity for certain enumerated intentional torts, Congress created a remedy, but that remedy should be limited to its plain terms and understood in light of the purposes that it was intended to serve. I think the place the Pellegrino majority went wrong is that it read words very much out of context to strain to create a remedy that Congress has simply not created. And I would really point this court in terms of... Which I can't be sure because there was no TSA when the Tort Claims Act was... That's true, Your Honor, but I think... I would urge this court to look to the Supreme Court's Dolan decision, which, again, interpreted the postal exception to the waiver of sovereign immunity. And there, the court recognized that creates an exception to the federal Torts Claims Act for a claim arising out of the loss, miscarriage or negligent transmission of letters or postal matter. And the Supreme Court was quite clear that it was possible to read negligent transmission of mail to encompass something like a postal carrier's putting mail on someone's front steps in a way that was dangerous and caused them to slip or fall, or that it might theoretically be read out of context to... By its plain terms, if you read that just in isolation, to apply to a postal carrier who hit somebody while he was driving on his way to deliver the mail. But the court, and not applying any particular narrowing or broadening construction canons, said that that was not an appropriate way to read negligent transmission, notwithstanding that it could be construed that way and notwithstanding that that, too, is a phrase in the disjunctive. And it said it should be read to refer only to a narrower category of negligent transmission that encompassed, for example, damaging or destroying the mail on the way to getting it delivered. Here, too, I think it would really read the proviso out of context to extend it to any administrative search of the type at issue here. Thank you, Ms. Swinton. We would ask the court to affirm. Mr. Thompson? Thank you, Your Honour. I'd just like to clarify a point on the legislative history. Obviously, we argue in our brief, and we think it's correct, that it's clear and unambiguous and the court need not resort to legislative history. And the Supreme Court's decision in Millbrook takes that approach. However, there was not a debate in the Congress about whether it should be employee or officer at the time this bill passed. The legislative history cited in the dissent of Pellegrino is a hearing that took place 11 days after this bill at issue was signed by the President. March 16, 1974, this bill was signed by the President. It was a bill that dealt with reorganization of the INS. The law enforcement investigative officer proviso was thrown on there at the last minute by Senator Ervin in the Senate. The legislative history is very unclear. 11 days later, on March 27, 1974, the House, not even the people who threw the amendment on, had a hearing on a different bill. And that's where the legislative history that talks about employee versus officer comes in. If this court wants to look at subsequent legislative history, I'd recommend it look at the STRIP Act, which is a law that was introduced in Congress to take away the officer title that TSOs have. And that law said, please take it away unless you do one of two things. It's right in the STRIP Act. Either give them federal law enforcement officer benefits or train them like federal law enforcement officers. This law went nowhere? It went nowhere. Okay. But what happened is the TSA started training. As far as I'm concerned, spend your time on something else because so many acts are introduced in Congress. There was also a second point I'd like to address here. Standard operating procedures of the TSA do provide that certain TSOs can, when they find a gun or explosive or something like that, they can detain the witness. And they can at section 2.422 of the standard operating provisions. Retention of evidence is another thing that can be done in order until either local or other law enforcement to come into place. Finally, last point, negligence, which is a claim that Mr. Iverson brought in this case as well. And that case- But you also pleaded battery, right? Pleaded both, yes. Why would you plead battery in a case like this? I've wondered that from the first time I read this brief. It's pled in the alternative, Your Honor. I think because- Yeah, but why would anybody plead it having read the statute? I think it was pled in the alternative, not knowing confidence, first of all, that these are investigative officers that fall under the limited exception. But also because this was a case where there was some touching during the course of the search. And it's pled as though that touching was offensive and things like that. But the negligence claim, the failure to take precautions and let Mr. Iverson lean on a table because he was on crutches, that goes back no matter what. And because it's pled in the alternative. And this court in Billingsley actually said when it's got two claims out there, and one automatically could go back, it remanded for discovery for that second issue. On the policy issue, Congress did make a policy decision here. It made a policy decision to write in broad terms about what is really a limited exception. There are only six intentional torts. Four of them are directly related to interactions with the person. Assault, battery, false arrest, false imprisonment, the kinds of things TSOs are engaged in. They have to touch people in order to do their jobs. But it has not resulted and will not result in some kind of floodgate of litigation. TSA actually keeps records on these things. And in 2017, out of almost 800 million people that went through security, only 92, 92 raised complaints for personal injury. Written complaints? What kind of complaints? I see 92 sometimes. Yeah, there's an administrative process. So they have to go through the administrative process. Formal complaints. And before they can even sue. Correct. Before they sue. My time is up, so thank you so much. Thank you. Also, Ms. Swenson.